## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLES F. COLFACK, | ) | CASE NO. 4:04CV3206 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1383. The Court has carefully considered the record (Filing No. 11) and the parties' briefs (Filing Nos. 13, 16).

## PROCEDURAL BACKGROUND

The Plaintiff, Charles F. Colfack, filed his initial applications for disability and SSI benefits on January 14, 2003. (Tr. 96-98, 273-75.) The claims were denied initially (Tr. 62-66, 271-81) and on reconsideration. (Tr. 669-73, 284-88.) An administrative hearing was held before Administrative Law Judge ("ALJ") Hugh Stuart on May 17, 1995 (Tr. 295-333) and before ALJ Ron Lahners[1] on November 9, 2003 (Tr. 334-362). On January 7, 2004, the ALJ issued a decision finding that Colfack was not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits. (Tr. 22-37.) On February 23, 2004, the ALJ issued an amended opinion incorporating new medical evidence and reaching the same conclusion that Colfack was not "disabled" and therefore

_____

[1]Hereinafter referred to as "the ALJ."

was ineligible for either disability or SSI benefits.  (Tr. 22-37.)  On April 4, 2004, the Appeals Council denied Colfack's request for review.  (Tr. 8-11.)  Colfack now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Colfack claims that the ALJ's decision was incorrect because the ALJ failed to: 1) appropriately weigh the opinion of Colfack's treating physician; 2) properly apply *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986) in determining that Colfack could perform his past relevant work.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Colfack is now fifty-three years old.  (Tr. 96.)  He completed high school in 1971 as a "special vocational student," receiving below average grades.  (Tr. 149-152, 303, 308.)  In 1972 and 1973, he attended, but did not complete, a radio and television servicing program.  (Tr. 308-09.)   Colfack's past relevant work includes work as a security guard, cashier and a small products assembler.  (Tr. 123, 112, 309-10.)  Since May 15, 2001, Colfack has not engaged in any substantial gainful employment.  (Tr. 96, 273.)

### *Colfack's Testimony*

At the initial hearing, Colfack testified that he lives with and is supported by, his girlfriend, Loraine Boardman.  (Tr. 301-02, 321.)  At the time of the hearing in May of 1995, Colfack weighed approximately 375 pounds.  (Tr. 302, 308.)   He registered with the job

2

service in Grand Island, Nebraska, hoping to secure a job in a convenience store or as a security guard.  (Tr. 303.)  Colfack reads some, and he earned a driver's license.  (Tr. 304, 305.)   Colfack struggles with everyday arithmetic, and he often uses his fingers for counting.  (Tr. 306.)  Colfack testified that in the preceding fifteen years he fixed telephone equipment and also worked as a security guard, a convenience store clerk, and a cashier. (Tr. 309 -11.)

Colfack characterized his most serious medical problem as his eyesight, adding that his vision interfered with his ability to perform his former job as a convenience store clerk. (Tr. 313.)  Colfack also described pain and numbness in his fingers, chest pains, pain throughout his right side, leg pain, a breathing problem, and an inability to stand for long periods that interfered with his ability to work as a security guard.  (Tr. 313-14.)  Colfack takes no prescribed medication.  (Tr. 318.)  Colfack stated that his vision and inability to stand are his most problematic medical issues.  (Tr. 315.)  Colfack stated that he could stand for two to three hours and lift between ten and twenty pounds.  He added that he has difficulty climbing stairs and picking up small objects due to the lack of feeling in his fingers. (Tr. 316-17.)   Colfack's daily activities include walking around the block, watching television, straightening his bed, and resting for two to three hours.  Colfack drives short distances during the day, but he cannot drive after dark.  (Tr. 317-18.)  In 1994, Colfack's eyesight was 20/40 and 20/30 for close vision.  However, Colfack stated that, despite those figures, his vision was poor.  (Tr. 323.)  In about 1987, Colfack last investigated a job service.  (Tr. 324.)  Colfack never attended vocational rehabilitation.  (Tr. 325.)  Despite Colfacks medical problems, he testified that between his high school graduation and his 1995 hearing he had only sought medical treatment from an eye doctor.  (Tr. 327.)

3

At the November 18, 2003, hearing before ALJ Lahners, Colfack testified that he was six feet tall and weighed 302 pounds. (Tr. 338.) Since his last hearing, Colfack lost weight and gained back 100 pounds during the two years prior to the second hearing. Colfack stated that he became unable to work as of May 19, 2001, due to his diabetes and his eyesight. (Tr. 339, 340.) At the time of the 2003 hearing Colfack was being seen by Ira Priluck, M.D., an eye doctor, and Daniel Harrahill, M.D., a general practitioner. Colfack was taking the following medications, one of which caused him to become drowsy: Cephalexin; Monopril; and Glucovance. (Tr. 341, 345.)

Colfack testified that during the prior fifteen years he had performed the jobs of security guard, a cashier, and an assembler of small products. (Tr. 340.) His inability to climb and to walk caused difficulty with his job as a security guard. Generally, Colfack was able to walk between half of a block and a couple of blocks before he would need a five-minute sitting break. (Tr. 342-43.) Colfack testified that his fingers are sometimes numb, which makes him drop things. (Tr. 343.) He stated that the numbness became worse during the preceding year. (Tr. 344.) He testified that he can lift up to twenty pounds and sit for up to thirty to forty-five minutes. (Tr. 345.) Colfack stated that he had several eye surgeries in the past, and that he experiences blurred vision from one to four times weekly due to "floaters" that obstruct his vision. (Tr. 346-47.) Colfack's blurred vision lasts between tn and thirty minutes. (Tr. 352.) Colfack also described a diabetic ulcer on his foot that had troubled him between twelve and eighteen months. (Tr. 347-48.) He wears diabetic shoes, and a home health nurse visits weekly to check the ulcer and check his blood sugar. (Tr. 348, 353.) Colfack does not check his own blood sugar. (Tr. 353.)

4

In 2003, Colfack's daily activities included: reading a newspaper and drinking coffee; a daily ninety-minute afternoon nap; watching the evening news; walking for periods of time totaling one or two hours daily; and sitting in the back yard. Colfack has no hobbies. (Tr. 344-45.) He testified that he quit his job as a security guard because he could no longer walk. (Tr. 349.)

**Vocational Expert's Testimony**

Testimony was also heard from a vocational expert ("VE"), at both hearings. At the 1995 hearing, testimony was heard from VE Gail Leonhardt, under contract with the Social Security Administration ("SSA").[2] (Tr. 355-61.) The final hypothetical posed to the VE in 2003 assumed someone of Colfack's age, education and past work history as to exertion and skill level, who could lift up to twenty pounds occasionally and ten pounds frequently, sit for six ours or stand for six hours with normal breaks, and walk up to thirty minutes per walk time, and occasionally climb ramps or stairs. The hypothetical also included somewhat limited far and near acuity of the eyes, limiting the individual's ability to perform jobs requiring good vision. (Tr. 356.) The VE opined that this individual would be able to perform his past relevant work as a security guard or a cashier if he could read. (Tr. 357.) Both occupations are available in significant numbers in the regional and national economies. (Tr. 358.) Primarily, the VE testified that a cashier's position would be preferable. (Tr. 359.) The VE added that packaging or assembly work might also be options, depending on the visual requirements of the particular job. (Tr. 359-60.)

**Documentary Evidence Before the ALJ**

---

[2]Gail Leonhardt's curriculum vitae is in the record. (Tr. 84-85.)

In addition to oral testimony, the ALJ considered various pieces of medical evidence.  The record shows that on February 2, 2001, Colfack went to Eye Physicians, P.C., complaining of flashes and floaters in his vision.  He described blurred vision and reported that the upper half of his vision was black.  The doctor suggested that Colfack have a physical, and stressed to Colfack the importance of keeping his blood sugar under control.  (Tr. 223.)  The following day, Colfack was admitted to the hospital for an operation to repair a detached retina.  Ira Priluck, M.D., reported a successful operation and that from an "ocular standpoint" Colfack did well.  (Tr. 203.)  Nevertheless, Colfack was hospitalized through February 5, 2001, to stabilize his elevated blood sugar levels.  (Tr. 203.)  Edward Horowitz, M.D., saw Colfack during his hospitalization due to his suspected diabetes mellitus.  (Tr. 23.)  Colfack admitted that he had not checked his blood sugar in three years, was drinking "six packs of beer five days a week," and had gained 100 pounds during the previous two years.  (Tr. 208.)  Dr. Horowitz recommended that Colfack see a "regular" doctor regarding his hyperglycemia.  Dr. Horowitz suggested that Colfack follow a diabetic diet and increase his exercise.  (Tr. 209.)

On February 21, 2001, Colfack saw Peter Diedrichsen, M.D., because he slipped out of his roller chair and bumped his head.  He reported seeing floaters and bubbles in his visual field.  Dr. Diedrichsen found nothing unusual, reassured Colfack, and recommended that he continue his medications and keep his eye appointment with Dr. Priluck.  (Tr. 221.)

On April 12, 2001, Colfack saw Julie Janky, M.D. for a consultative disability evaluation.  (Tr. 244-46.)  Dr. Janky noted that after Colfack admitted failing to followup with a physician as ordered after his February 2001 hospitalization for uncontrolled

6

diabetes.  (Tr. 244.)  At the time, Colfack weighed between 375 and 400 pounds.  Dr.

Janky reported that Colfack's best corrected visual acuity was 20/25 in the right eye and

20/30 in the left eye. She diagnosed Colfack with: status post retinal detachment repair in

both eyes, stable at the time; diabetes without retinopathy; bilateral pseudoaphakia; and

uncontrolled diabetes.  (Tr. 245.)  Dr. Janky noted that Colfack's visual acuity was very

good, but that he had constriction in his visual fields due to his previous surgeries that

might interfere with a job requiring good peripheral vision.  She recommended continued

followup in light of his previous surgery.  (Tr. 245-46.)

On April 24, 2001, Colfack first saw Larry Hansen, M.D., for his diabetes.  Stating

that he had been released from the hospital and told to diet and exercise for his diabetes,

he asked whether he could simply "take a pill" for his diabetes.  Dr. Hansen diagnosed

Colfack with diabetes mellitus, retinal detachment, obesity and conjunctivitis.  (Tr. 231.)

Through August 7, 2001, Colfack continued to see Dr. Hansen approximately on a monthly

basis for treatment of his diabetes.  (Tr. 227-31.)  Colfack had additional complaints of

tingling in his hands and legs, some dizziness, and an abrasion on his right ankle.  (Tr.

227, 229-30.)   Dr. Hansen adjusted Colfack's diabetes medications and prescribed

additional medication for his ankle abrasion. Dr. Hansen's diagnosis included: non-insulin

dependent diabetes mellitus; retinal detachment; obesity; and conjunctivitis.   On May 1,

2001, Colfack's diabetes medication, Avandia, was refilled.  Colfack saw Dr. Hansen again

for followup on June 26, 2001, and on August 7, 2001.  (Tr. 227-31.)

The record does not include further medical evidence until February 13, 2003, when

John Cannella, M.D., performed a consultative disability examination on Colfack at the

request of the Disability Determination Section.  (Tr. 237-40.)  Colfack, who then weighed

7

302 pounds, reported a two-year history of Type II diabetes, eye surgeries, and that he was taking prescribed medications Avandia and Monopril. Colfack noted that he left his job as a security guard in November of 2000 primarily due to problems with other employees. Colfack's primary physical complaint was foot pain and a non-healing ulcer on his foot. (Tr. 237.) Dr. Cannella noted that Colfack had decreased vision, occasional dizziness, some arthralgia,[3] and soreness in his right foot for the past year and a half. (Tr. 238.) The neurological examination showed normal vibration, pain sensation and foot motion, but some mild drainage was seen in Colfack's sock despite the appearance of a dry foot ulcer. Colfack was able to get out of his chair and onto the examination table without difficulty, his gait and station were normal, and he walked without assistive devices. (Tr. 239.) Dr. Cannella noted that Colfack's previous job as a security guard would be difficult due to his foot ulcer. He recommended that Colfack followup with his regular physician and undergo physical therapy for the ulcer on his foot. Finally, Dr. Cannella opined that due to Colfack's young age, if his vision allowed, he might be suitable for vocational rehabilitation for a sedentary occupation. (Tr. 240.)

On February 14, 2003, Dr. Janky again examined Colfack on a consultative basis. (Tr. 241-43.) Colfack reported that he could not see at night and found it difficult to see the television and perform household chores (Tr. 241.) She diagnosed Colfack with: background diabetic retinopathy; macular edema secondary to diabetes; history of high myopia with myopic degeneration; scleral buckle secondary to retinal detachments; and

---

[3]"Arthralgia" is joint pain that generally is non-inflammatory. STEDMAN'S MEDICAL DICTIONARY 149 (27th ed. 2000).

8

pseudoaphakia.[4]  Dr. Janky noted that Colfack's impaired visual acuity due to diabetic retinopathy and myopic degeneration changes and his stereo vision limit his ability to perform a job requiring good vision.  Dr. Janky suggested that Colfack return to see her as needed, and she scheduled an appointment for him to see Dr. Priluck in Omaha for an evaluation of the macular edema of the right eye.  (Tr. 242.)

On February 26, 2003, Dr. Priluck examined Colfack.  He reported Colfack's vision as 20/30 in the right eye and 20/40 in the left eye.   Dr. Priluck placed no restrictions on Colfack, adding that he was unaware that Colfack had any problem reading, speaking, hearing or traveling.  (Tr. 249.)

On March 12, 2003, upon referral of the Department of Health and Human Services, Colfack saw Tony Smolik, M.D., III, for his diabetes and foot ulcer.  Dr. Smolik noted Colfack's family history for diabetes and diagnosed Colfack with diabetes mellitus, poorly controlled.  In particular, Dr. Smolik noted a Grade 3 ulcer on Colfack's right foot.  He prescribed medication and physical therapy for the ulcer.  He noted that Colfack was intelligent, yet Colfack lacked insight into his illness.  Colfack was not taking his prescribed medications, Avandia and Monopril, and he refused a laboratory evaluation.  Dr. Smolik also noted that Colfack was obese, and he discussed with Colfack the importance of diet and exercise.   Dr. Smolik prescribed the antibiotic Cipro for the foot ulcer and recommended physical therapy and surgical evaluation if the wound failed to heal.   On April 4, 2003, the home health nurse telephoned Colfack and learned that his leg wound

---

[4]Pseudoaphakia is defined as "a condition in which the degenerated crystalline lens is replaced by mesodermal tissue."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1379 (28th ed. 1994) (cited in the Defendant's Responsive Brief (Filing No. 16), at 3 n.1)

appeared infected and Colfack was out of his antibiotic.  A three-week course of Keflex was prescribed.  (Tr. 255.)

On April 24, 2003, Colfack saw Daniel Harrahill, M.D., for his diabetes and related problems.  Dr. Harrahill noted that Colfack's diabetes was uncontrolled, his last reported blood sugar was more than 300, and he had no equipment with which to test his blood sugars. Dr. Harrahill changed Colfack's diabetes medication to Avandamet and diagnosed him with uncontrolled diabetes, mild hypertension with diabetic nephropathy, and severe ulceration of his right foot.  (Tr. 262.)  Colfack returned on June 12, 2003, and Dr. Harrahill noted that Colfack was visually impaired and unable to walk due to the enlarged foot ulcer. He also noted Colfack's poorly controlled blood sugars.  (Tr. 261.)  On June 19, 2003, Colfack reported that he was taking his diabetes medications regularly, his blood sugars were good, and Dr. Harrahill noted that the foot ulcer had improved and shrunk to 2.0 centimeters.  On July 3, 2003, Dr. Harrahill noted that the ulcer had shrunk even further to 1.3 centimeters and appeared better.   (Tr. 260.)

On September 8, 2003, Dr. Harrahill wrote a letter regarding Colfack's impairments. He wrote that Colfack was followed by home health for his diabetes which had just come under control during the current year.  Dr. Harrahill noted that Colfack was also undergoing treatment for a diabetes-related decubitus ulcer on his right foot.  He reported that while Colfack's ulcer had shown improvement, he was at risk for severe osteomyelitis.  Dr. Harrahill noted that Colfack was unable to walk with any regularity and required assistance with daily activities and wound care.  He also noted that Colfack had essential blindness for most activities which impaired his daily activities and his ability to work.  (Tr. 264.)  On September 14, 2003, Colfack returned to see Dr. Harrahill.  Dr. Harrahill noted that

Colfack's foot ulceration was 1.0 centimeter or less in diameter.  Dr. Harrahill completed his notes, stating "[c]ontinue to look for social services disability for him."  (Tr. 259.)

On January 4, 2004, Dr. Harrahill completed a Medical Impairment Evaluation and a Physical Capacities Evaluation.  (Tr. 265-71.)  He opined that Colfack's condition prevented him from performing his previous work.  (Tr. 266.)  Dr. Harrahill stated that walking might aggravate Colfack's impairment and that he would have pain sufficiently severe to "often" interfere with his attention and concentration.  Dr. Harrahill described Colfack's symptoms as: leg pain secondary to ulcer; and fatigue secondary to blood sugar elevation.  (Tr. 267.)  Dr. Harrahill stated that Colfack could sit for six hours and stand or walk for two hours during a workday with normal breaks.  Dr. Harrahill noted that Colfack could frequently lift up to fifty pounds and frequently carry up to twenty pounds.  He found no deficiencies in Colfack's ability to reach, grasp, or perform fine manipulations.  Dr. Harrahill noted that Colfack could seldom operate foot controls with his right foot and occasionally operate foot controls with his left foot.  (Tr. 269.)  He limited Colfack to occasional bending, squatting, crawling, and climbing.  Dr. Harrahill opined that Colfack could: never work at unprotected heights; seldom work around moving machinery; and occasionally be exposed to temperature extremes, drive automotive equipment, and be exposed to dust, fumes, or gas.  He stated that Colfack could never work at a rapid pace and would often need to work at a slow pace.  Dr. Harrahill noted that Colfack would need to have the freedom to change positions at will and take unscheduled breaks to walk once or twice daily for fifteen minutes at a time.  However, Dr. Harrahill noted that Colfack did not need to elevate his legs or lie down.  Finally, Dr. Harrahill noted that Colfack could work no more than 3 days per week.  (Tr. 270.)

11

Dr. Priluck completed a Medical Impairment Evaluation on January 22, 2004.  (Tr. 292-94.)  He stated that activities requiring better than 20/40 vision might aggravate Colfack's condition.  (Tr. 292.)  Dr. Priluck opined that Colfack could occasionally use near visual acuity, far visual acuity, depth perception, and accommodation.  (Tr. 293.)

### THE ALJ'S DECISION

The ALJ found that Colfack was not "disabled" pursuant to his January 14, 2003, application for disability benefits under disability or SSI benefits under Title XVI benefits.  (Tr. 37.)  Generally, the ALJ framed the issues as: 1) whether Colfack was entitled to disability and SSI benefits under the Act; and 2) whether Colfack was "disabled."  (Tr. 22-23.)

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920[5] to determine whether Colfack was disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to his . . . ability to perform past relevant work or other work that exists in the regional and national economies.  This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 23.)

Following this analysis, the ALJ found that Colfack is not disabled.  (Tr. 37.)  Specifically, at step one the ALJ found that Colfack has not performed any substantial gainful work activity since May 15, 2001.  (Tr. 23.)  At step two, the ALJ found that Colfack has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: non-insulin dependent diabetes mellitus with retinopathy and right

---

[5]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.  For simplicity, further references will only be to § 404.1520.

12

foot ulcer; and status post surgery for retinal detachment.  (Tr. 30.)  At step three, the ALJ found that Colfack's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." The ALJ noted that Colfack did not contend that his impairments met the listings.   However, the ALJ determined that Colfack's impairments "have imposed some limitation upon his ability to perform basic work-related functions, as noted earlier in this decision."  (Tr. 30.)  At step four, the ALJ determined that, despite Colfack's medically determinable impairments, he possesses the residual functional capacity to perform his past relevant work as a security guard and cashier.  (Tr. 36.)

Finally, at step five the ALJ found: 1) Colfack has the residual functional capacity to perform additional occupations testified to by the vocational expert, i.e. light cleaning positions; packager and assembler of larger products; and 2) such jobs exist in "tremendous" numbers in the regional economy.  (Tr. 36.)  In so deciding, the ALJ weighed Colfack's testimony, finding the testimony not credible insofar as "it attempted to establish total disability."  (Tr. 37.)  The ALJ also carefully considered the medical records submitted by treating doctors Ira A. Priluck, Edward A. Horowitz, Dr. Diedrichsen, Larry L. Hansen and  Dan Harrahill, and the opinions of consultative doctors Drs. Julie P. Janky, John J. Cannella and Tony Smolik.  (Tr. 23-29.)

### STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the

district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to

14

whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding: 1) Colfack has not performed any substantial gainful work activity since May 15, 2001; 2) Colfack has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: non-insulin dependent diabetes mellitus with retinopathy and right foot ulcer; and status post surgery for retinal detachment; 3) Colfack's medically determinable impairments, either singly or collectively, do not meet the "listings," noting however, that Colfack's impairments "have imposed some limitation upon his ability to perform basic work-related functions"; 4) despite Colfack's medically determinable impairments, he has the residual functional capacity to perform his past relevant work as a security guard and cashier, and these jobs exist in significant numbers in the regional economy; and 5) Colfack has the residual functional capacity to perform additional

occupations testified to by the vocational expert that exist in "tremendous" numbers in the regional economy, i.e. light cleaning positions; packager and assembler of larger products.

### PAIN ANALYSIS

### OPINION OF COLFACK'S TREATING PHYSICIAN

"The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an opinion inconsistent with other evidence as a whole. *Id.* at 1013; *Holmstrom,* 270 F.3d at 720. "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'" *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)). Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give "good reasons" for that weighting. *Holmstrom,* 270 F.3d at 720*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Harrahill, Colfack's primary treating physician, submitted numerous pieces of documentary evidence, summarized above.

In Colfack's case, the ALJ discounted Dr. Harrahill's opinion as follows:

Dr. Harrahill's statements of December 8, 2003 (Exhibit C-17F) that the Claimant is unable to walk with any regularity or use his foot in routine activities, he requires assistance with activities of daily living and that he has "essential blindness for most activities", are not substantiated by the

16

objective evidence of record (including Dr. Harrahill's own treatment notes at Exhibit C-16F which actually indicate significant improvement in the Claimant's foot ulcer and diabetes with compliance with medical treatment) or the Claimant's own statements regarding his functional capabilities as noted earlier (e.g. he is able to see well enough to drive a car, read a newspaper and watch television, and he is able to do his own cooking, laundry and grocery shopping). In addition, while Dr. Harrahill stated that the Claimant's diabetes has been in poor control until the last year, the Claimant's noncompliance with recommended treatment was a significant factor in such poor control and, as noted earlier, since being compliant with prescribed treatment, the Claimant's diabetes has responded favorably. For the above reasons, Dr. Harrahill's report is not afforded significant weight.

Similarly, Dr. Harrahill's reports of January 4, 2004 (Exhibit C-18F) in which he indicated that the Claimant's foot ulcer is "disabling" are also not afforded significant weight.  In this regard, it is noted that such assessment is inconsistent with the objective findings in the record, including Dr. Harrahill's own progress notes which, as noted earlier, document significant improvement in the Claimant's foot ulcer with medication compliance to the extent that the Claimant was taken off Keflex on July 3, 2003 when the ulcer was 1.3 mg (Exhibit C-16F/2) with the ulcer being "down to about 1 cm or less in diameter" when last seen on September 4, 2003 (Exhibit C-16F/1). Further, while Dr. Harrahill indicated that the Claimant suffers from leg pain secondary to the ulcer which is sufficiently severe as to often interfere with attention and concentration, it does not appear from Dr. Harrahill's treatment notes (Exhibit C-16F) that he has ever prescribed pain medications for the Claimant.  Dr. Harrahill also indicated in the reports that the Claimant's impairments or conditions do not affect his ability to see (Exhibit C-18F/2), which conflicts with his report dated a few weeks earlier, in which he stated that the Claimant has severe visual loss with visual scores "indicating essential blindness for most activities" (Exhibit C-17F).  In addition, while Dr. Harrahill indicated that the Claimant has a maximum workload of only up to 3 days per week, he did not set forth a supporting rational [sic] for his conclusion.

(Tr. 34-35.)

This Court has carefully reviewed the record and agrees with the ALJ's summary of Dr. Harrahill's reports.  The opinions set out in the reports differ significantly with medical evidence of both treating and consultative physicians, summarized previously, including Dr. Harrahill's own treatment notes.

17

The ALJ evaluated Dr. Harrahill's opinion appropriately.  The ALJ's conclusion that the treating physician's opinion was inconsistent with evidence in the record as a whole is supported by substantial evidence.  *See Dunahoo,* 241 F.3d at 1038 (finding that the treating physician's opinion was contradicted by the opinions of four other physicians).

### Credibility of Colfack's Testimony

Colfack argues that the ALJ did not properly apply the correct standard in evaluating Colfack's subjective complaints of pain, which led to a finding that the ALJ found that Colfack's testimony was not credible.

The ALJ found that Colfack's testimony was not credible in light of the criteria set forth in 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p.  Specifically, the ALJ found that the medical evidence[6] "does not substantiate [Colfack's] allegations with respect to the extent of his symptoms and limitations, and does not support a finding of disability.  The ALJ continued, discussing specific examples in detail.  For example, the ALJ pointed out inconsistencies between Colfack's vision complaints and the record.  Dr. Priluck, Colfack's treating ophthalmologist, reported in February of 2003 that Colfack"s vision was 20/30 in the right eye and 20/40 in the left eye.  Dr. Priluck placed no restrictions on Colfack, and Colfack is able to drive, read the newspaper, watch television, cook, and do laundry and his own grocery shopping.  (Tr. 33.)  The ALJ also referred to Colfack's noncompliance with his diabetes regimen, i.e. his failure to check his blood sugar in three years, his failure to acquire the apparatus to check his blood sugar, and his 100 added pounds.  (Tr. 33-34.)  The ALJ also described instances in which Colfack refused treatment

---

[6] "Objective medical evidence" is defined at 20 C.F.R. §§ 404.1529 and 416.929.

18

and failed to adequately care for his serious foot ulcer.  (Tr. 34.)  The ALJ also pointed out

that, despite Colfack's claims that he had no feeling in his fingers and dropped things, Dr.

Cannella's neurological evaluation was normal.  (Tr. 34.)  The record does not support

Colfack's statement that he needed a daily afternoon nap, and the ALJ noted that Colfack

never mentioned his alleged fatigue to his treating physicians.  (Tr. 34.)  The ALJ also

noted with some detail Colfack's contradictory statements relating to matters such as the

last time Colfack worked, the reason he left his employment as a security guard, side

effects and the effectiveness of Colfack's medications, and Colfack's daily activities.  (Tr.

34.)

The credibility afforded Colfack's testimony in its entirety is crucial because, in

determining the fourth and fifth factors relating to a claimant's residual functional capacity

to perform past relevant work and a range of work activities in spite of his impairments, the

ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain

complaints.  The underlying issue is the severity of the pain.  *Black v. Apfel,* 143 F.3d 383,

386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's

subjective pain complaints."  *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing

*Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828,

830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if

inconsistencies are apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d

742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected

inconsistencies that discredited the Colfack's complaints of pain) (quoting *Gray v. Apfel,*

192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, i.e., pain.

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th

Cir. 2000).  This duty is fulfilled when an ALJ acknowledges the *Polaski* factors and clearly

examines the factors before discounting the claimant's testimony.  An ALJ is "not required

to discuss methodically each *Polaski* consideration."  *Id.* at 972.

Federal regulations provide that an ALJ must consider all symptoms, "including pain,

and the extent to which symptoms can reasonably be accepted as consistent with the

objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R.

§ 416.929.  Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be
> observed, apart from your statements (symptoms). Signs must be shown by
> medically acceptable clinical diagnostic techniques. Psychiatric signs are
> medically demonstrable phenomena that indicate specific psychological
> abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory,
> orientation, development, or perception. They must also be shown by
> observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

> "Laboratory findings" are defined as: "anatomical, physiological, or
> psychological phenomena which can be shown by the use of medically
> acceptable laboratory diagnostic techniques. Some of these diagnostic
> techniques include chemical tests, electrophysiological studies
> (electrocardiogram, electroencephalogram, etc.), roentgenological studies
> (X-rays), and psychological tests."

20 C.F.R. § 416.928(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of

a claimant's statements is the consistency of the claimant's various statements and the

consistency between the statements and the other evidence in the record.  Ruling 96-7p

provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the
> medical signs and laboratory findings and other information provided by
> medical sources, including information about medical history and treatment.

21

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996). [7]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Colfack's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Colfack's subjective pain complaints. In making a credibility determination, the ALJ considered: Colfack's lack of substantial gainful activity

---

[7]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

since May 15, 2001; Colfack's daily activities that included driving, exercise, laundry, cooking and grocery shopping; Colfack's pain, medications and functional restrictions. *See Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (affirming the ALJ's discount of claimant's subjective complaints of pain, where the Colfack cared for one of his children on a daily basis, drove a car infrequently, and occasionally went grocery shopping).

The ALJ exhaustively considered the medical opinions of both treating and consultative physicians, and he very specifically described discrepancies between Colfack's statements and the evidence, including medical evidence and Colfack's own contradictory statements.  The ALJ correctly engaged in the *Polaski* analysis.  The ALJ set out the standards stated in §§ 404.1529 and 416.929, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p.  The ALJ's conclusion that Colfack's pain is not severe enough to prevent him from engaging in some of his past relevant work as performed was well-founded, and followed an appropriate express credibility determination regarding Colfack's assertion of subjective complaints.

In summary, the ALJ appropriately determined that Colfack's testimony was not credible with respect to the extent of his symptoms and limitations.

### Past Relevant Work

The ALJ bears the primary responsibility for assessing Colfack's residual functional capacity based on the relevant evidence.  However, Colfack's residual functional capacity is a medical question.  *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001).   The ALJ must resolve any conflict in the medical evidence.  *Id.*  However, some medical evidence "'must support the determination of the claimant's [residual functional capacity], and the

23

ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Id. at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).  "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Id.* (quoting *Lauer,* 245 F.3d at 704).

In Colfack's case, the ALJ followed the procedures in determining that Colfack retained the residual functional capacity to return to some of his past relevant work.  The ALJ considered, among other things, records from both treating and agency physicians. Conflicts existed among those opinions, and therefore the ALJ examined factors including, but not limited to, Colfack's failure to obtain or follow through with treatment.  Although not required to do so, the ALJ inquired of a vocational expert and posed a hypothetical that accurately reflected Colfack's impairments.  Taking all of the evidence into consideration, the Court finds that the ALJ properly determined the fourth and fifth steps of the inquiry.

Therefore, this Court agrees that the ALJ properly determined that Colfack can return to his past relevant work as a security guard and cashier.

### *Residual Functional Capacity*

Residual functional capacity is defined as what Colfack "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations.  *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).

24

The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining residual functional capacity, an ALJ first must evaluate a claimant's credibility.  In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322.  The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

In this case, the ALJ set out the language describing the appropriate standard under *Polaski* and § 404.1529. (Tr. 22-23.) The ALJ summarized Colfack's testimony, described his daily activities according to the testimony and documentary evidence. (Tr. 24-27.) The ALJ found Colfack's testimony not credible "insofar as it attempted to establish total disability." (Tr. 37.)  The ALJ specifically considered, in addition to Colfack's testimony, documentary evidence including reports of treating and consultative physicians, and the testimony the vocational expert.  The VE opined that Colfack had the residual functional capacity to perform his past relevant work as a security guard and cashier as well as jobs such as a light cleaning position, and packager and assembler of large products.  The VE testified that all of the jobs discussed exist in significant numbers in the regional economy.

**CONCLUSION**

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 29th day of June, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge